In the Matter of WENDELL WILLIAMSON, Respondent

No. COA01-638

(Filed 2 July 2002)

**1. Mental Illness— not guilty by reason of insanity—unsupervised passes within hospital**

The trial court had jurisdiction to decide whether a respondent who had been found not guilty of murder by reason of insanity should be granted unsupervised passes on the premises of Dorothea Dix Hospital. N.C.G.S. § 122C-62(b) requires a court order expressly authorizing visits "outside the custody of the facility" for respondents found not guilty by reason of insanity; in a case of first impression, the Court of Appeals finds that visits "outside the custody of the facility" includes unsupervised passes or visits on the hospital premises in addition to off-campus visits.

**2. Mental Illness— due process—unsupervised passes within hospital grounds—no protected interest**

Respondent's right to due process was not violated where he was found not guilty of murder by reason of insanity and committed to Dorothea Dix Hospital; there was testimony at respondent's annual review that he remained mentally ill but had improved and that his treatment plan for the upcoming year included unsupervised passes within the premises of the hospital; and the court denied the passes. Respondent does not have a protected liberty interest in obtaining unsupervised passes.

IN RE WILLIAMSON

[151 N.C. App. 260 (2002)]

**3. Mental Illness— equal protection—patients not guilty by reason of insanity and others involuntarily committed—rational basis for distinction**

The trial court's exercise of jurisdiction in determining whether a respondent found not guilty of murder by reason of insanity should have unsupervised passes on the premises of Dorothea Dix Hospital did not violate equal protection. The statutory distinction between patients found not guilty by reason of insanity and other classes of involuntarily committed patients is not a suspect classification, nor does it involve a fundamental right subject to strict scrutiny, and respondent has not shown the lack of a rational basis for the distinction. There is a need to keep the public safe from individuals who have committed violent, dangerous, or other criminal acts resulting in their involuntary commitment.

**4. Mental Illness— separation of powers—approval of therapeutic treatments by courts**

The trial court did not violate separation of powers in determining whether a respondent who had been found not guilty of murder by reason of insanity should have unsupervised passes on the premises of Dorothea Dix Hospital.

Appeal by respondent from order entered 14 December 2000 by Judge Robert H. Hobgood in Orange County Superior Court. Heard in the Court of Appeals 13 February 2002.

*Attorney General Roy Cooper, by Assistant Attorney General Angel E. Gray, for the State.*

*Martin & Martin, P.A., by J. Matthew Martin and Harry C. Martin, for the respondent.*

BRYANT, Judge.

On 26 January 1995, respondent Wendell Williamson randomly fired an M-1 rifle at unarmed pedestrians in the downtown area of Chapel Hill, North Carolina. Two pedestrians were killed as a result of the shooting. Respondent was charged with two counts of first degree murder, and was found not guilty by reason of insanity following a jury trial in Orange County Superior Court. Respondent was thereafter involuntarily committed to Dorothea Dix Hospital pursuant to N.C.G.S. § 15A-1321.

Respondent was transferred to Broughton Hospital by order entered on 26 January 1998. On 17 December 1998, respondent was transferred again to Dorothea Dix Hospital pursuant to court order. Since then, respondent has continuously resided within the forensic treatment program at Dorothea Dix Hospital.

Pursuant to N.C.G.S. § 122C-276.1, an annual review of respondent's involuntary commitment came before the 11 December 2000 term of Orange County Superior Court with the Honorable Robert H. Hobgood presiding. At the hearing, the trial court heard testimony from respondent's two expert witnesses, Dr. Mark Hazelrigg (the director of the forensic treatment program at Dorothea Dix Hospital) and from Laura Dale (a clinical social worker at the Dorothea Dix Hospital).

Dr. Hazelrigg testified that respondent remained mentally ill with a diagnosis of paranoid schizophrenia. Dr. Hazelrigg further described respondent's illness as a psychiatric disorder characterized by delusions and hallucinations including harboring beliefs that people were trying to harm him. Dr. Hazelrigg testified that the severe psychiatric symptoms of respondent's mental illness were currently kept under control through use of a medicine regimen. In addition, Dr. Hazelrigg testified that, in his opinion, respondent remained a danger to others and that he "cannot assure that [respondent] would be safe if he were released to the community at this point."

According to Dr. Hazelrigg, the medicine regimen was only part of respondent's treatment plan. Respondent was also involved in group activities and group therapies on his ward and attended individual therapy sessions on a regular basis. Dr. Hazelrigg testified that the goals of this treatment plan were to keep respondent's psychosis symptoms in remission, to improve respondent's insight into his illness and the need for treatment, and to improve respondent's overall functioning.

Dr. Hazelrigg testified that following this treatment plan, during the past year, respondent had improved his insight into his illness, and had gained a better understanding of past events. In Dr. Hazelrigg's opinion, respondent's symptoms of depression were not as prevalent as compared to previous years.

According to Dr. Hazelrigg, respondent was on level 3 of privileges as of the date of the hearing, which meant respondent was allowed to have a job on the ward and to attend therapy groups and

sessions on the ward. With level 3 privileges, respondent could attend classes and other off-ward groups and activities with one-to-one staff supervision. In addition, respondent was allowed to leave the ward to attend leisure activities with one-to-one staff supervision and to have visitors on the ward.

Dr. Hazelrigg then discussed the treatment team's plans for the upcoming year of commitment and its recommendation that the respondent be given unsupervised passes on the premises of Dorothea Dix Hospital. These passes would start out at 5 to 10 minute increments with the unsupervised time gradually increasing as respondent established responsibility. Respondent would be allowed to obtain an off-ward work assignment and/or to enroll in courses and engage in other off-ward activities. Dr. Hazelrigg testified that respondent could not achieve further therapeutic gains until such passes were authorized, and that the passes could be safely administered in the discretion of the treatment team. However, evidence was introduced that the campus of Dorothea Dix Hospital was not surrounded by a fence, and other patients who have been given unsupervised pass privileges have escaped from the hospital in the past.

Laura Dale, a clinical social worker on the forensic treatment unit and a member of respondent's treatment team, testified that respondent had gained more insight into his illness and had begun to accept responsibility for his past actions. Dale testified that respondent had been attending AA, NA and other group functions on his unit. However, Dale testified that at times, respondent attended group meetings on an inconsistent basis and had not fully participated in some other ward activities. Notwithstanding respondent's inconsistent attendance and lack of full participation, Dale testified that she was in support of the treatment team's recommendation that respondent be allowed to have unsupervised passes on the grounds of Dorothea Dix Hospital.

Following Dr. Hazelrigg and Dale's testimony, the trial court voiced its concern regarding the "potential danger to the public . . . should the Respondent be allowed unsupervised passes and escape from Dorothea Dix Hospital." The trial court found that "any benefit of the unsupervised passes is outweighed by the danger to the public of the Respondent having unsupervised passes." On 14 December 2000, the trial court denied the treatment team's recommendation of any unsupervised passes for the respondent. To this denial of unsupervised passes, respondent gave notice of appeal on 22 December 2000. Respondent presents three issues on appeal.

IN RE WILLIAMSON

[151 N.C. App. 260 (2002)]

## I.

[1] The first issue involved in this case is whether the trial court had jurisdiction pursuant to N.C.G.S. § 122C-62(b) to decide whether the respondent should be granted unsupervised passes on the premises of Dorothea Dix Hospital. It appears that prior case law has not addressed this issue; therefore, it is the responsibility of this Court to determine the legislative intent in drafting this statute and to interpret the statute accordingly.

Section 122C-62(b) of the North Carolina General Statutes reads in pertinent part:

(b)  Except as provided in subsections (e) and (h) of this section, each adult client who is receiving treatment or habilitation in a 24-hour facility at all times keeps the right to:

. . .

(4)  Make visits outside the custody of the facility unless:

a.  Commitment proceedings were initiated as the result of the client's being charged with a violent crime, including a crime involving an assault with a deadly weapon, and the respondent was found not guilty by reason of insanity or incapable of proceeding;

. . .

A court order may expressly authorize visits otherwise prohibited by the existence of the conditions prescribed by this subdivision. . . .

N.C.G.S. § 122C-62(b) (2001)[1].

In interpreting N.C.G.S. § 122C-62(b), we must determine what the legislature intended by requiring a court order to expressly authorize visits "outside the custody of the facility" for respondents found not guilty of a crime by reason of insanity (NGRI). At the outset, we note that it is "an accepted rule of statutory construction that ordinarily words of a statute will be given their natural, approved, and recognized meaning," unless the statute provides a definition of a term. *City of Greensboro v. Smith*, 241 N.C. 363, 366, 85 S.E.2d 292,

---

1. As the statute clearly states that a court order may expressly authorize visits otherwise prohibited, it logically follows that absent express authorization granted via court order, a NGRI patient such as respondent has no right to visits outside the custody of the facility.

294 (1955). Because the statute does not define the phrase "outside the custody of the facility," we must construe this phrase in accordance with its plain meaning to determine the legislative intent. *See Electric Supply Co. v. Swain Electrical Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991).

Respondent contends that the term "outside the custody of the facility" as used in N.C.G.S. § 122C-62(b)(4) refers to visits off the hospital premises versus unsupervised visits while remaining on the premises. Specifically, respondent argues that technically you remain in the custody of the department even when taking unsupervised visits on the hospital premises. Therefore, respondent asks this Court to construe "outside the custody of the facility" very narrowly to encompass only off-campus visits. We, find respondent's argument unpersuasive.

*Black's Law Dictionary* 267 (Abridged 6th ed. 1991) defines custody as:

> The care and control of a thing or person. The keeping, guarding, care, watch, inspection, preservation or security of a thing carrying with it the idea of the thing being within the immediate personal care and control of the person to whose custody it is subjected. Immediate charge and control, and not the final, absolute control of ownership, implying responsibility for the protection and preservation of the thing in custody. Also the detainer of a man's person by virtue of lawful process or authority.
>
> The term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession. . . . Accordingly, persons on probation or parole or released on bail or on own recognizance have been held to be "in custody" . . . .

*See also, The American Heritage College Dictionary* 341 (3rd ed. 1997); *Webster's New World College Dictionary* 357 (4th ed. 1999). It is clear from the definition of custody provided above, the term custody encompasses both the physical supervision of a person in addition to having constructive supervision (i.e., legal authority) over a person. We do not accept that our legislators meant for the term custody as referenced pursuant to N.C.G.S. § 122C-62(b) to be defined as narrowly as respondent argues. We find that the plain language of the statute requires a court order prior to NGRI

patients, such as respondent, being granted visits outside the custody of the facility. Further, we find that visits outside the custody of the facility include unsupervised passes or visits on the hospital premises in addition to off-campus visits. Therefore, we overrule this assignment of error.

## II.

Second, respondent argues that the trial court's exercise of jurisdiction in determining whether respondent should have unsupervised passes on the premises of Dorothea Dix Hospital violated his right to due process and equal protection under the law. We disagree.

### a. Due Process

[2] Due process restricts the government from taking actions that would unjustly deprive an individual of his liberty or property interest within the meaning of the due process clause of the Fifth Amendment as applied to the States by the Fourteenth Amendment. *Peace v. Employment Sec. Comm'n of N.C.*, 349 N.C. 315, 321, 507 S.E.2d 272, 277 (1998). Therefore, our first inquiry into whether respondent has received due process under the law, is to determine whether respondent has a protected liberty interest in obtaining unsupervised passes.

This Court is of the opinion that respondent does not have a protected liberty interest in obtaining unsupervised passes. As previously stated, N.C.G.S. § 122C-62(b) requires court approval via a court order for a NGRI patient such as respondent to obtain visits outside the custody of the facility. Having determined that visits outside the custody of the facility include unsupervised passes on the hospital premises in addition to visits off the premises, we find that it is solely within the trial court's determination whether respondent is entitled to unsupervised passes. Respondent does not have a protected liberty interest in obtaining passes for unsupervised visits on the hospital premises, therefore, we overrule this assignment of error.

### b. Equal Protection

[3] In addition, respondent argues that the distinction in the treatment of NGRI patients and other classes of involuntarily committed patients violates the Equal Protection Clause of the United States Constitution and the parallel provisions of the "Law of the Land Clause" of the North Carolina Constitution. We disagree.

**IN RE WILLIAMSON**

[151 N.C. App. 260 (2002)]

This Court stated in *Dept. of Transp. v. Rowe*, 138 N.C. App. 329, 343, 531 S.E.2d 836, 845 (2000), *rev'd on other grounds*, 353 N.C. 671, 549 S.E.2d 203 (2001), *cert. denied*, 534 U.S. 1130, 151 L. Ed. 2d 972 (2002) (internal citations omitted):

> In addressing a claim that the Equal Protection Clause has been violated, the courts employ a two-tiered analysis.
>
> The upper tier is employed [w]hen a governmental act classifies persons in terms of their ability to exercise a fundamental right . . . or when a governmental classification distinguishes between persons in terms of any right, upon some 'suspect' basis. . . .
>
> This tier, calling for strict scrutiny, "requires the government to demonstrate that the classification is necessary to promote a compelling governmental interest."
>
> The lower tier is employed "[w]hen an equal protection claim does not involve a 'suspect class' or a fundamental right. . . ." "This mode of analysis merely requires that distinctions which are drawn by a challenged statute or action bear some rational relationship to a conceivable legitimate governmental interest."

The distinction between NGRI and other involuntarily committed patients is not a suspect classification. *See, e.g., In re Declaratory Ruling by N.C. Comm'r of Ins.*, 134 N.C. App. 22, 36, 517 S.E.2d 134, 144 (1999) ("[T]o evoke a greater level of scrutiny under the equal protection clause, the discrimination at issue must invoke a suspect class such as race or national origin."); *Smith v. Keator*, 21 N.C. App. 102, 108, 203 S.E.2d 411, 416 (1974) (stating that among the suspect criteria subjecting a statute to strict scrutiny are race, alienage and national origin). Nor does the distinction involve a fundamental right that is subject to strict scrutiny review—a fact alluded to by respondent in his appellate brief. *See, e.g., In re Johnson*, 45 N.C. App. 649, 652, 263 S.E.2d 805, 808 (1980) ("Procreation, together with marriage and marital privacy, are recognized as fundamental civil rights protected by the due process and equal protection clauses of the Fourteenth Amendment"). Thus, as long as the statutory classification at issue bears some rational relationship to a legitimate governmental interest, the statute will survive constitutional scrutiny. *See Abbott v. Town of Highlands*, 52 N.C. App. 69, 75-76, 277 S.E.2d 820,

825 (1981). The burden is on the party arguing against the statute to demonstrate its unconstitutionality. *Currituck County v. Willey*, 46 N.C. App. 835, 836, 266 S.E.2d 52, 53 (1980).

NGRI patients are patients that have been involved in criminal proceedings and have been acquitted based on their mental state at the time they committed the criminal act. In the case at bar, respondent randomly fired a rifle at unarmed pedestrians resulting in two deaths, but was acquitted at trial based on his mental state. There exists a need to monitor and keep the public safe from individuals (such as respondent) that often times have committed violent, dangerous or other criminal acts resulting in their involuntary commitment. We find that respondent has not shown that a rational basis does not exist for the distinction in classification. Therefore, we overrule this assignment of error.

### III.

[4] Last, respondent argues that the trial court's exercise of jurisdiction determining whether respondent should have unsupervised passes on the premises of Dorothea Dix Hospital violated the separation of powers. Specifically, respondent argues that the judiciary has not been delegated with the duty to determine what therapeutic treatments should be afforded to NGRI patients (including whether they should receive unsupervised passes). For the reasons stated in section I, we overrule this assignment of error.

AFFIRMED[2].

Judges WALKER and HUNTER concur.

---

2. We note that at oral argument, respondent's counsel stated that at respondent's annual review pursuant to N.C.G.S. § 122C-276.1, held on 10 December 2001, Judge Howard E. Manning, Jr., granted respondent transfer passes. According to respondent's counsel, the terms specified by the trial court were that the transfer passes are to be no more than ten minutes in duration; the passes may only be used to attend certain staff supervised activities; and the transfer process is to be initiated and confirmed with telephone correspondence. During the transfer process, respondent is allowed to walk unescorted from one location to his final destination.